UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                    :
SHARI HUTCHINSON,                                   :
                                                    :   CASE NO. 1:08-CV-2966
        Plaintiff,                                  :
                                                    :
    v.                                              :   OPINION & ORDER
                                                    :   [Resolving Doc. Nos. 75 & 82]
CUYAHOGA COUNTY BOARD OF                            :
COUNTY COMMISSIONERS, *et al.*,                     :
                                                    :
        Defendants.                                 :
                                                    :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

    In this sexual orientation discrimination case, Defendants Cuyahoga County Board of County Commissioners, Joe Gauntner, James Viviani, Tony Sharaba, and Mary Jane Coleman move, under Federal Rule of Civil Procedure 56, for summary judgment. [Doc. 75.] The Defendants also move to strike portions of the summary judgment record. [Doc. 82.][1/] Plaintiff Shari Hutchinson opposes both motions. [Doc. 77.; Doc. 83.] For the following reasons, the Court grants in part and denies in part the Defendants' motion for summary judgment. The Court denies as moot the Defendants' motion to strike.

---

[1/] The Court notes that under Federal Rule of Civil Procedure 56(c)(1)(B), a party may, as part of its motion for summary judgment, "object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Advisory Committee's 2010 Notes to Fed. R. Civ. P. 56. "There is no need to make a separate motion to strike." *Id.*

Case No. 1:08-CV-2966
Gwin, J.

I.

The Court's first task at summary judgment is to determine whether there remains a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). If no such dispute exists, the Court "shall grant summary judgment if the movant . . . is entitled to judgment as a matter of law." *Id.* If, however, there is a genuine dispute as to any material fact, the Court must deny the motion so that the dispute can be resolved by the jury.

Not every factual dispute will preclude the entry of summary judgment. Only disputes about facts that are material, *i.e.*, "facts that might affect the outcome of the suit under the governing law," will preclude the entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, the factual dispute must be genuine, that is, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Finally, record materials supporting the existence of a genuine factual dispute must be in the form of evidence that could ultimately be admitted at trial. The Defendants say that some of Hutchinson's submissions could not be admitted into evidence at trial and so must be discarded. Those identified materials being irrelevant to resolving the Defendants' motion for summary judgment, the Court will assume, for its present purpose, that such materials are inadmissible.

II.

Hutchinson, a gay woman, claims that the Defendants violated her right to Equal Protection when—arguably on account of her sexual orientation—they refused to hire her for, or promote her to, a number of positions within the Cuyahoga County Child Support Enforcement Agency

Case No. 1:08-CV-2966
Gwin, J.

("CSEA").[2/] She brings her claim under 42 U.S.C. § 1983, which, among other things, provides a cause of action to plaintiffs whose federal rights have been violated by persons acting under color of state law.

Because Hutchinson has no direct evidence of discrimination, her claim is subject to the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citation omitted) (quoting *McDonnell Douglas*, 411 U.S. at 802-04); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 566-67 (6th Cir. 2004) ("To prove a violation of the equal protection clause under section 1983, a plaintiff must prove the same elements . . . as are required to establish a disparate treatment claim under Title VII, i.e., under the *McDonnell Douglas/Burdine* framework.") (quoting *Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003)).

Hutchinson must therefore show: (1) that she is a member of a protected class; (2) that she was otherwise qualified for promotion or hire; (3) that she was denied promotion or hire; and (4) that she was treated differently from similarly-situated employees outside the protected class. *See, e.g.*, *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).

Hutchinson has carried this modest burden. "Homosexuals, while not a 'suspect class' for

---

[2/] Hutchinson has offered no argument with respect to her previously claimed violations of due process or the First Amendment. Accordingly, she has abandoned those claims.

Case No. 1:08-CV-2966
Gwin, J.

equal protection analysis, are entitled to at least the same protection as any other identifiable group which is subject to disparate treatment by the state." *Glover v. Williamsburg Local Sch. Dist. Bd. of Educ.*, 20 F. Supp. 2d 1160, 1169 (S.D. Ohio 1998) (citing *Stemler v. City of Florence*, 126 F.3d 856, 874 (6th Cir. 1997)).  Furthermore—and the Defendants do not claim otherwise—Hutchinson was qualified for each of the positions for which she unsuccessfully applied.[3]  Finally, each of those positions was filled by an otherwise-similarly-situated, yet heterosexual, applicant.[4]

The burden therefore shifts to the Defendants to demonstrate some legitimate, nondiscriminatory reason for the County's decisions not to select Hutchinson.  The Court will address each position in turn.

### A.  The *Program Officer 4* Position

The following several paragraph discussion provides no context what the issue is or what factors are important to that discussion.  Plaintiff Hutchinson complains that Defendants discriminated against her when, in 2007, they denied her placement to a Program Officer 4 position after earlier indicating that she would have the position.  In early August 2007, Child Support Agency Deputy Director Mary Davis decided to temporarily place Hutchinson in an open Program

---

[3] The positions at issue are:  (1) Program Officer 4; (2) Support Enforcement Manager; and (3) Budget Management Analyst.  Hutchinson has abandoned her claims with respect to the Budget Officer 2 and Training Officer Supervisor positions.  *See* [Doc. 77 at 3 n.5.]

[4] The Defendants argue that Hutchinson fails to meet her burden to produce evidence that the successful applicants were heterosexual because Hutchinson "does not know whether her comparators are gay or straight."  [Doc. 81 at 3 n.5.]  This conclusion both misstates Hutchinson's burden and ignores portions of the summary judgment record.  As an initial matter, Hutchinson is not required to prove her comparators' sexual orientation to a mathematical certitude.  She need only produce evidence sufficient for a jury to conclude by a preponderance of the evidence that those persons are heterosexual.  The record reflects that one of the successful applicants had identified a spouse on their emergency contact form—that spouse's name being most commonly associated with a person of the opposite sex, while another was recently married.  *See, e.g.*, [Doc. 76-4 at 20; Doc. 79-45 at 111:23-112:2.]  That suffices.

Case No. 1:08-CV-2966
Gwin, J.

Officer 4 position. This Temporary Working Level ("TWL") appointment was intended to fill a "mission critical" need. S*ee* [Doc. 79-2 at 1.] However, the Hutchinson's appointment also required (1) the Child Support Agency Director's request and justification to the Office of Human Resources, (2) Human Resources's approval, and (3) an affirmative vote of the Board of County Commissioners (the "Board").

On August 3, 2007, Deputy Director Davis asked Child Support Director Cassondra McArthur to make the request and justification to Human Resources for Plaintiff Hutchinson's appointment, which McArthur made on August 8, 2007. Human Resources approved McArthur's request for Hutchinson's appointment on September 6, 2007, and asked that Hutchinson's appointment be placed on the Board's September 19, 2007, agenda.

The parties dispute whether the Board approved Hutchinson's Temporary Working Level appointment on September 19, 2007. Hutchinson insists that the Board of County Commissioners approved the appointment on that date; the Defendants insist otherwise. Both have competent evidence to support their respective positions. But whatever the case may be, the parties do agree that on September 25, 2009, the Board voted to approve Hutchinson's Temporary Working Level from the period August 6, 2006 through September 21, 2007. Whether characterized as an approval or a termination of Hutchinson's placement in this temporary position, it is undisputed that on September 25, 2009, the Board ended Hutchinson's Temporary Working Level. (At that same meeting the Board also voted to end three other employees' TWLs, each ending effective September 21, 2007.)

Months went by with the "mission critical" Program Officer 4 position remaining vacant. Then, in April 2008, Jill Albrecht was appointed to the TWL Program Officer 4 position. Deputy

Case No. 1:08-CV-2966
Gwin, J.

Director Davis, who had previously recommended Hutchinson to the post, did not do so again because then-Deputy Director Viviani "discouraged" it, [Doc. 79-6 ¶ 20], telling Davis that he thought it "wo[uldn't] fly like it didn't fly last time," [Doc. 80 at 24:10-24:25.] Hutchinson's direct supervisor, Thomas Lempke, was told something similar: "[M]y bosses told me it that it wasn't going to happen, so to come up with a new plan." [Doc. 79-45 at 72:18-20.] Lempke did not know the reason why. [*Id.* at 73:18-74:9.] In October 2008, the Commissioners permanently hired Sabrina Frey for the Program Officer 4 position.[5]

The Defendants offer two non-discriminatory explanations for selecting Albrecht and then Frey but not Hutchinson for the Program Officer 4 Position: (1) On September 19, 2007, McArthur announced her resignation from the post of Agency Director, effective September 28, 2007; and (2) The Board had concerns about Hutchinson's "level-headedness." [Doc. 81 at 9.] As explained by the Defendants, Director McArthur's resignation "caus[ed] a natural pause so as not to saddle a new CSEA Director with the outgoing Director's departing appointments." *Id.* at 13. This justification finds support in the Board's termination of three other temporarily assigned employees on the same date that it terminated Hutchinson's. *See also* [Doc. 79-46 at 52:23-53:5.] And similarly, a lack of "level-headedness," would be a legitimate reason not to promote Hutchinson. Accordingly, the Defendants have produced a legitimate, non-discriminatory reason for not selecting Hutchinson for the Program Officer 4 position.

But Hutchinson, for her part, has produced evidence that the Defendants' non-discriminatory explanations are pretextual. *See Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) ("We have explained that a plaintiff will usually demonstrate pretext by showing that the employer's

---

[5] Hutchinson, too, applied for this permanent Program Officer 4 position but was not selected.

Case No. 1:08-CV-2966
Gwin, J.

stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." (quotation marks omitted)). First, Hutchinson has presented an audio recording of Viviani admitting to Davis that the Board "did not want to fill [the Program Officer 4 position] because [the Commissioners] did not want to deal with Shari Hutchinson." [Doc. 80 at 20:30-20:46.] When Deputy Director Davis asked why Hutchinson would not receive the Program Officer 4 Position, Viviani responded:

> I think they told her they didn't want her in the TWL. They pulled it from the fourth floor[6] from my understanding and then they didn't want to post it cause they didn't want to deal with her not getting the TWL and her applying for it and not wanting to put her in that position permanently probably, and not wanting to deal with that whole issue.

Id. at 20:46-21:10.

When Deputy Director Davis then reminded then-Deputy Director Viviani that Hutchinson was "very qualified" and that "you can't really hold out giving them the job if they come out being the most qualified candidate," Viviani cut her off: "Well you can if you're the Commissioners." Id. at 21:10-21:53. Viviani explained:

> But you know internally, no. I think internally we make our recommendation and then same as we did before probably and then they decide what they're doin'. . . . You know, like when you were putting in the TWL. All of a sudden they were all cancelled . . . . Fourth floor didn't want her in that position, you know? They pulled the TWL and they wanted to hold up the permanent posting cause they didn't want to deal with it. . . . The only thing I would guess for certain is if that we try to do Shari I think it won't fly like it did last time, why I dunno . . . . All I was told was that, and, and because they didn't want to discriminate against her they cancelled all the TWLs.

Id. at 21:53-24:35.

---

[6] According to Viviani, "generally we just referred to the fourth floor, which meant that's where all the, all the authority was, the commissioners were there, the county administrator was there, the HR director was there, the OBM director was there, so usually we just referred to it as the fourth floor. And it basically could have been any of those areas . . . ." [Doc. 79-46 at 50:10-18.]

-7-

Case No. 1:08-CV-2966
Gwin, J.

This recording seriously undermines the Defendants' first proffered legitimate, non-discriminatory reason. According to Director Viviani, the "fourth floor" rescinded Hutchinson's TWL not for the purpose of providing a "natural pause" between Child Support Enforcement Agency Directors but instead because they were determined not to select Hutchinson for the Program Officer 4 post, either on a temporary basis or otherwise.

Furthermore, the Defendants' second explanation—that Hutchinson was not level-headed—is undermined by her positive performance reviews. Those reviews rate her "Inter-personal relations" as above average and include such comments as: "works well with others," "well liked by coworkers," and "personable, congenial, gracious." *See generally* [Doc. 79-38.] The disconnect between these reviews and the Defendants' proffered justifications creates genuine issues of fact that must be resolved by the jury.

Summary judgment is therefore inappropriate.

### B. The *Support Enforcement Manager* Position

In July 2008, the County Child Support Enforcement Agency posted an available Support Enforcement Manager position. Hutchinson, along with three others, applied. Each applicant was interviewed and scored. Mark Dorony scored the highest while Hutchinson scored third. The Agency gave Dorony the position.

The Defendants explain that Dorony—who they say was the most qualified applicant—was the logical selection. Dorony had been with CSEA continuously since 1989 and, indeed, had even been serving in the Support Enforcement Manager position as a temporary appointee since March 2008.

Case No. 1:08-CV-2966
Gwin, J.

But again, Plaintiff Hutchinson presents evidence that casts doubt on the Defendants' explanation. She shows that the Support Enforcement Manager position was originally posted in February—not July—2008. Hutchinson and Dorony, along with two others, had applied to the February posting, but Dorony had failed to submit his writing sample by the deadline.[7/] According to the Defendants, Dorony's failure resulted from an email snafu, in that "his writing sample did not properly attach to the email and instead 'was inadvertently lost into cyberspace.'" [Doc. 81 at 16.] Hutchinson and two other applicants completed and submitted their writing samples on time.

According to the application instructions, "Candidates who do not return the writing sample or do not return the writing sample within the required time frame will not be invited to interview." [Doc. 79-25.] Nevertheless, then-Deputy Director Viviani tried to afford Dorony "another 2 hour time frame ASAP to again respond to the questions." [Doc. 79-26.] After some back and forth between Gauntner, Davis, Viviani, Lempke, and Human Resources, the decision was made—contrary to Viviani's recommendation—not to permit Dorony another opportunity. *See id.* The hiring process was to proceed without Dorony.

Then, in late May 2008, Viviani was promoted to the position of Child Support Enforcement Agency Director. [Doc. 79-29.] Just a few weeks after that, on June 18, 2008, Hutchinson received a letter regarding the Support Enforcement Manager position. It read in part: "The CSEA Director has determined that we will not be moving forward with filling the position at this time. Rather, this position will be re-posted at a later date." [Doc. 79-28.] As recounted above, when the position was re-posted in July 2008, Dorony was selected.

As Hutchinson sees it, the July 2008 re-posting was a thinly veiled (and successful) effort to

---

[7/]Those four candidates had also completed a standardized test, with Hutchinson earning the highest score.

-9-

Case No. 1:08-CV-2966
Gwin, J.

prevent Hutchinson from being selected for the Support Enforcement Manager position. A reasonable jury could agree. The record supports Hutchinson's view—correct or not—that the County was not in fact interested in hiring the most qualified, eligible candidate who had properly completed the application but instead was interested in hiring the most qualified candidate who was not Hutchinson, whether or not that candidate had been rendered ineligible by the County's regular hiring processes.

Accordingly, Hutchinson has put forth evidence sufficient that a reasonable jury could conclude that Dorony's selection was for a reason other than the one offered by the Defendants. *See Risch*, 581 F.3d at 391 ("[A] plaintiff will usually demonstrate pretext by showing that the employer's stated reason . . . was not the actual reason."). Summary judgment is therefore inappropriate.

### C. The *Budget Management Analyst* Position

In 2010, a Budget Management Analyst position became available in the County's Office of Budget Management. Hutchinson applied. Soon after, a second Budget Management Analyst position became available. One-hundred-forty-three persons applied for the two positions, with ninety-four of those applicants meeting the minimum qualifications. Of those with the minimum qualifications, thirty-seven—Hutchinson included—were invited to pre-interview testing. Hutchinson passed the test and was invited, along with eleven other applicants, to the first round of interviews. She was then invited, along with four others, to a second round of interviews.

Following the second round of interviews, the County Budget Office numerically scored the five remaining applicants. The two highest-scoring applicants—Shawntaye McCurdy and Wendy

Case No. 1:08-CV-2966
Gwin, J.

Feinn—were selected to fill the two positions. McCurdy scored a ninety-one; Feinn scored eighty-five. Hutchinson, who was the fifth-ranked applicant, scored a seventy-one.

The Defendants offer a simple and non-discriminatory reason for their selection of McCurdy and Feinn—they were the two highest-scoring applicants and, accordingly, the best fit for the positions.

Hutchinson must therefore demonstrate that the Defendants' explanation is pretextual. She has not. For one thing, Hutchinson makes no argument with respect to the County Budget Office's selection of Feinn, "tacitly conceding," as the Defendants argue, "its propriety." [Doc. 81 at 18]; *see* [Doc. 77 at 10-11.] And Hutchinson's only argument with respect to McCurdy's selection is that McCurdy's standardized test score was lower than her own. *See* [Doc. 77 at 11.][8/] The record reflects, however, that the standardized test scores were never the sole determinant in selecting among applicants. Rather, the process consisted of standardized test scores and two rounds of interviews. And when Hutchinson's standardized test scores were combined with her interview scores, Hutchinson ranked fifth. Nor has Hutchinson argued—or, more importantly, identified any record materials tending to show—that the Budget Management Analyst interview process or scoring of that process was discriminatory.

Accordingly, Hutchinson has failed to produce evidence of pretext with respect to her non-selection to the Budget Management Analyst position. Summary judgment on this portion of her

---

[8/] Hutchinson's claim that McCurdy "failed" the standardized test is unsupported by the record materials she cites. Although McCurdy's standardized test score was substantially lower than Hutchinson's, Hutchinson has presented no evidence that McCurdy's score fell below any "cut-off." Indeed, the materials she cites reflect that the Defendants were unaware of the cut-off score for this particular test. *See* [Doc. 79-47 at 88:1-89:17.]

Case No. 1:08-CV-2966
Gwin, J.

claim is therefore appropriate.[9]

### III.

The Defendants' remaining argument—that Hutchinson has failed to demonstrate that any discrimination was the result of an official policy or custom—fails.

As an initial matter, Hutchinson has sued the individually named Defendants in their official capacities only. Such "official-capacity" suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). That is, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

"[A] governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law." *Id.* (citations and internal quotation marks omitted). Accordingly, in order to prevail on her claim, Hutchinson must show not only that her rights were violated, but also that those violations were the result of the County's illegal policy or custom. *Monell*, 436 U.S. at 694.

At the outset, the Defendants point to the County's written policy prohibiting discrimination on the basis of sexual orientation. *See* [Doc. 76-4 at 4.] But that alone does not disprove the existence of an unwritten policy of unlawful discrimination. And a governmental policy or custom

---

[9] Hutchinson alleges several other forms of disparate treatment, specifically, (1) that in 2008 she received unauthorized punishment for an alleged violation of County policies, (2) that she was denied ordinary annual performance reviews for several years, and (3) that in 2010 she was transferred against her will to a new division. Because the parties dispute even the most basic facts surrounding these incidents, *e.g.*, whether Hutchinson ever violated County policy or whether annual performance reviews were indeed ordinary, summary judgment on these claims is inappropriate.

Case No. 1:08-CV-2966
Gwin, J.

need not be formalized to give rise to liability under *Monell*. A plaintiff may recover for a municipality's *unofficial* illegal custom or practice, where such custom is "so permanent and well settled as to constitute a custom or usage with the force of law." *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). To have such force of law, the custom "must reflect a course of action deliberately chosen from among various alternatives." *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). "In short, a 'custom' is a 'legal institution' not memorialized by written law." *Id.* (citing *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)).

Materials in the record, if believed, support a reasonable inference that the Defendants have an unofficial custom of discriminating against persons on the basis of their sexual orientation. For one thing, Director Viviani's comments regarding the fourth floor's "authority" demonstrate that "if you're the Commissioners," you can, at minimum, "hold out giving [an applicant] the job [even] if they come out being the most qualified candidate." [Doc. 80 at 21:10-21:53.] Furthermore, those same comments make explicit that the Commissioners—or others with fourth-floor authority—use that authority to single out particular applicants, and may have used that authority in Hutchinson's case. *See id.* at 20:30-24:35. There can be no doubt that the Commissioners' "edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. What's more, a reasonable reading of the record demonstrates that upon his promotion to the Child Support Enforcement Agency Director position, Viviani himself felt empowered to prevent Hutchinson from being selected for the Support Enforcement Manager position. And that Hutchinson has (until recently) apparently gone for years without an annual evaluation—a circumstance Gauntner agreed was "unusual," [Doc. 79-48 at 72:2-6], and Lemke described as "unprecedented," [Doc. 79-45 at 101:17-

-13-

Case No. 1:08-CV-2966
Gwin, J.

102:10]—is additional evidence of the County's custom of differential treatment.

"Though *Monell* was concerned with a general policy enforced against a large class of individuals, it seems reasonable to conclude that its teachings are equally applicable to a specific policy directed at just one individual," as long as the summary judgment record adequately "support[s] the inference that unconstitutional action was taken against the individual pursuant to such policy." *Turpin v. Mailet*, 619 F.2d 196, 202 n.7 (2d Cir. 1980) (quoting *Smith v. Ambrogio*, 456 F. Supp. 1130, 1134 n.3 (D. Conn. 1978)). So it does here.

CONCLUSION

For these reasons, the Court (1) grants in part and denies in part the Defendants' motion for summary judgment and (2) denies the Defendants' motion to strike as moot.[10]

IT IS SO ORDERED.

Dated: September 26, 2011                    s/     *James S. Gwin*
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE

---

[10] To the extent that Hutchinson's Opposition purports to move for partial summary judgment, *see* [Doc. 77 at 14], that motion is similarly denied.

-14-